## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRISTOPHER JAMES WALKER, KIM STERLING, and ERNIE FISHER** on behalf of themselves and all others similarly situated,<br><br>                             **Plaintiff,**<br>      **v.**<br><br>**HIGHMARK BCBSD HEALTH OPTIONS, INC.; COTIVITI, INC.**<br><br>                             **Defendant.** | Civil Case No.: 20-cv-1975<br>Hon. Christy Criswell Wiegand |

## PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM

Contents

I.   INTRODUCTION...............................................................................1
II.   BACKGROUND ...............................................................................1

A.   Plaintiff's Allegations and Procedural History ..................................1

III.  LEGAL STANDARD .........................................................................3
IV.   DISCUSSION ...................................................................................4

A.   The Settlement Class Should be Finally Certified. ............................4

1.   Rule 23(a) is satisfied.................................................................4
2.   Rule 23(b)(3) is satisfied............................................................9

B.   The Settlement Should be Finally Approved......................................10

1.   Overview of Settlement ...........................................................10

a.   Cash Awards .....................................................................10
b.   Redistribution and Cy Pres ...............................................11
c.   Release ..............................................................................11
d.   Service Awards .................................................................11
e.   Attorneys' Fees and Costs .................................................12
f.   Administration and Notice ................................................12

2.   The Settlement meets the *Girsh* factors. ..................................12

a.   Complexity and duration of the litigation.........................12
b.   The reaction of the class. ..................................................15
c.   Stage of the proceedings ...................................................15
d.   Risks of establishing liability...........................................15
e.   Risks of establishing damages ..........................................16
f.   Risks of maintaining a class action ...................................16
g.   Ability of Defendants to withstand a greater judgment.....17
h.   Range of reasonableness in light of the best recovery and risks of litigation... 17

V.   CONCLUSION ................................................................................20

## I.    INTRODUCTION

Plaintiffs Christopher Walker, Kim Sterling, and Ernie Fisher ("Plaintiffs") respectfully move the Court for final approval of the class action settlement ("Settlement" or "Settlement Agreement")[1] between Plaintiffs and Defendant Highmark BCBSD Health Options Inc. ("Highmark") and Defendant Cotiviti, Inc. ("Cotiviti"; collectively, "Defendants"). [Dkt. 113-1.] Notice was successful and timely provided to 7,736 addresses (higher than the 7,403 Class Size due to some telephone numbers associated with multiple addresses in the reverse-lookup data), and resulted in 1,631 claims (21%),[2] two requests for exclusion (0.02%), and zero objections. These numbers indicate satisfaction from the Class with the Settlement. At this claims rate, the average claimant will receive approximately $54.54 per call, after the attorneys' fees, costs, and service awards requested, Dkts. 121-23, and administrative costs.

Accordingly, Plaintiffs respectfully request that the court grant final class certification and final approval to the Settlement Agreement, as well as approve the pending request for Attorneys' Fees, Costs, and Service Awards. [Dkts. 121-23.]

## II.    BACKGROUND

### A.    <u>Plaintiff's Allegations and Procedural History</u>

On November 30, 2020, Plaintiff Walker filed a complaint in the Court of Common Pleas, Allegheny County, Pennsylvania, alleging that, throughout 2020, Defendant Highmark repeatedly called his cell phone using a prerecorded or artificial voice. [Dkt. 1-1, Complaint, ¶¶ 19-30.] The calls appeared to be for someone else with whom Plaintiff Walker has no association, and Plaintiff

---

[1] Unless otherwise specified, capitalized terms carry with them the same definitions contained in the Settlement Agreement.

[2] This number may change due to duplicate and denied claims, but Epiq does not anticipate this change to be substantial. Declaration of Cameron R. Azari, Esq. ("Epiq Decl."), ¶ 23.

Walker had never been Defendant's customer. [*Id.*] Accordingly, Plaintiff Walker alleged that the prerecorded calls were made to Plaintiff without his consent and violated the Telephone Consumer Protection Act's ("TCPA"), 47 U.S.C. § 227(b), prohibition on prerecorded telephone calls to cell phones without the consent of the recipient. The TCPA provides for statutory damages of $500 to $1500 per call.

On December 21, 2020, Defendant Highmark removed the case to this Court. [Dkt. 1.] On January 26, 2021, Defendant Highmark moved to dismiss. [Dkt. 10.] On January 27, Plaintiff moved to remand on Article III standing grounds. [Dkt. 12.] On February 4, 2021, the Court denied Plaintiff's Motion to Remand, finding Article III standing present on the face of the complaint. [Dkt. 22.] The Court denied Defendant's Motion to Dismiss on May 14, 2021. [Dkt. 28.] After initial waves of discovery and an extension of deadlines, Plaintiff amended his complaint to add Defendant Cotiviti, Inc. on December 1, 2021. [Dkt. 71, Second Amended Complaint ("SAC").] Defendant Cotiviti was the entity with whom Defendant Highmark contracted to make the calls at issue.

On January 28, 2022 Defendant Cotiviti moved to Dismiss for Lack of Personal Jurisdiction and Improper Venue. [Dkt. 78.] On June 3, 2022, the Court denied this Motion. [Dkt. 90.]

On July 18, 2022, Plaintiff's counsel was retained by two additional individuals—Plaintiff Fisher and Plaintiff Sterling—whose allegations Plaintiffs contend are similar to Plaintiff Walker's. Notably, however, Plaintiff Fisher and Plaintiff Sterling received pre-recorded calls as part of different campaigns[3] than Plaintiff Walker. This is significant because of arguments

---

[3] Each of Defendants' calls were made as part of a "campaign"—i.e. a group of calls made to deliver information regarding a particular topic. Defendants had dozens of campaigns. Defendants' records indicate which calls were part of which "campaign."

Defendants had made and intended to make concerning the propriety of representing persons who received calls as part of campaigns that did not include calls to Plaintiff Walker, and about whether the calls to Plaintiff Walker fell under the "emergency purpose" or other exceptions. Plaintiffs Fisher and Sterling thus not only potentially brought in more calls and campaigns should Defendant's former argument be adopted, but some of the calls to Plaintiff Fisher and Sterling— such as survey calls—were arguably less likely to qualify under the emergency purpose or other exception than other calls such as those to Plaintiff Walker. Defendants were aware of Plaintiff Fisher and Plaintiff Sterling's participation prior to the July 27 mediation and, Plaintiffs believe that their participation was vital to its success.

On November 18, 2022, Plaintiffs sought, via consent motion, preliminary approval of the Settlement Agreement for which they now seek final approval. [Dkts. 112-13.][4] The Court granted this Motion on December 13, 2022. [Dkts. 116-17.] On January 23, 2023, Plaintiffs' filed a Motion for Attorneys Fees, Costs, and Service Awards. [Dkts. 121-23.]

## III.    LEGAL STANDARD

"The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). Furthermore, where the settlement would bind class members, "the court may approve [the settlement] only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Accordingly, "when a district court is presented with a class settlement agreement, the court must first determine that 'the requirements for class certification under Rule 23(a) and (b) are met, and must separately "determine that the settlement is fair to the class under [Rule] 23(e)."'" *In re NFL Players Concussion Injury Litig.* ("*NFL II*"), 775 F.3d 570, 581 (3d

---

[4] Much of this brief is taken from this Motion for Preliminary Approval, and updated for those factors that were not able or necessary to be assessed at the time of Preliminary Approval

Cir. 2014) (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 319 (3d Cir. 2011)).

## IV.   DISCUSSION

### A.   <u>The Settlement Class Should be Finally Certified.</u>

"Every class action much satisfy the requirements of Rule 23(a) and the requirements of

[Rule 23(b)(3).]" *Somogyi v. Freedom Mortg. Corp.*, 495 F. Supp. 3d 337, 346 (D.N.J. 2020).

The preliminarily certified Settlement Class is defined as follows:

A.   During the Class Period, all persons within the United States who are subscribers or primary users of a cellular telephone number to which Defendant Highmark BCBSD Health Options Inc. placed (or had placed on its behalf by Defendant Cotiviti, Inc.) a telephone call using a pre-recorded or artificial voice,

    1)   when such a call to that telephone number had previously resulted in a) a "WRONG_NUMBER" disposition or b) a "MSG_DECLINED" disposition without a subsequent disposition of "CORRECT_PERSON" or "MSG_HUMAN" and

    2)   when at least one subsequent call to that telephone number had the disposition "WRONG_NUMBER", "MSG_MACHINE", "CORRECT_PERSON", "MSG_HUMAN", "HANGUP", "NO_CONTINUE", or "MSG_DECLINED".

B.   Excluding those persons who *only* received calls as part of a COVID Campaign, as well as Defendants and any entities in which Defendants have a controlling interest; Defendants' agents and employees; any Judge and Magistrate Judge to whom this action is assigned and any member of their staffs and immediate families.

[Dkt. 120.]

### 1.   Rule 23(a) is satisfied.

Rule 23(a) requires (i) that the proposed class is so numerous that joinder of all individual class members is impracticable (numerosity); (ii) that there are common questions of law and fact amongst class members (commonality); (iii) that the proposed representative's claims are typical of those of the class (typicality); and (iv) that both the named-representative and his or her counsel have and will continue to adequately represent the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

4

**Numerosity**. In the Third Circuit, the numerosity requirement is generally satisfied when the number of class members exceeds 40. *Mielo v. Steak 'N Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018). Numerosity is met for the Settlement Class. The Class has 7,403 members and notice was sent to 7,736 addresses. This 7,403 number was derived by starting with the database of all persons to which Defendants placed the types calls at issue, filtering those down to only those telephone numbers with the dispositions and temporal requirements of (A)(1) and (2) of the Settlement Class definition, and then filtering those telephone numbers to identify which of those telephone numbers are cellular telephone numbers.

**Commonality**. Rule 23(a)(2) requires that there be questions of law or fact common to the class. "What matters to class certification … is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Ferreras v. Am. Airlines, Inc.*, 946 F. 3d 178, 185 (3d Cir. 2019). Rule 23(a)'s commonality requirement is met if "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Commonality is met for the class because there are numerous common questions, such as (i) whether Defendants placed pre-recorded voice calls to class members; (ii) whether Defendants had in place any policies, procedures, or processes to filter out wrong numbers from receiving pre-recorded voice calls or to permit revocation of consent; (iii) whether Defendants placed calls to class members who informed or otherwise put Defendants on notice that Defendants had the wrong number or revoked consent and (iv) whether the "emergency purposes" or another exception still applies to wrong number calls. These questions are all susceptible to generalized proof and would drive the resolution of the matter for the Class as a whole.

**Typicality.** Rule 23(a)(3) requires that the class representatives' claims be "typical of the claims … of the class." The Third Circuit has set a low threshold for typicality. *In re NFL* ("*NFL III*"), 821 F.3d 410, 428 (3d Cir. 2016). Typicality is found "where there is a strong similarity of legal theories or whether the claim arises from the same practice or course of conduct." *Id.* Plaintiffs' claims are typical of the Settlement Class claims. Plaintiffs received pre-recorded telephone calls intended for someone else. Each Plaintiff indicated to Defendant that it had the wrong number and received a "WRONG_NUMBER" disposition or had a "MSG_DECLINED" disposition without a subsequent "CORRECT_PERSON" or "MSG_HUMAN" disposition. Plaintiffs contend that each Plaintiff nevertheless continued to receive pre-recorded calls after receiving a disposition putting Defendants on notice that a wrong number was reached. Each Plaintiff maintains the same legal theory, namely that Defendants' pre-recorded calls after it knew or should have known it was calling a wrong number are unlawful under the TCPA. Finally, all calls to Plaintiffs fall within the defined Class period.

**Adequacy**. Rule 23(a)(4) requires the representative parties to fairly and adequately protect the interests of the Class. The adequacy requirement is met here. With respect to the proposed class representatives, this inquiry "serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625-26. This requirement tends to merge with the commonality and typicality inquiries, "which serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 626, n.20 (quotations and citations omitted). This requirement is easily met where

class representatives "closely follow[] the litigation, authorize the filing of the Class Action complaint, and approv[e] the final settlement."*NFL III*, 821 F.3d at 430.

Plaintiffs here have remained diligent and involved throughout this litigation. Plaintiffs and their counsel are in frequent communication about all aspects of the case. For his part, Plaintiff Walker timely responded to Defendants' discovery requests, asked pertinent and insightful questions throughout the case (including about the instant settlement), and remained available as needed to assist in the prosecution of all aspects of this case. As discussed previously, while Plaintiffs Fisher and Sterling were involved in this case for a shorter period of time, their participation was vital to the results achieved. Further, they too have remained readily available, promptly responding to any issues or concerns raised. Each Plaintiff authorized the filing of the contemporaneously filed amended complaint, and each Plaintiff approved the settlement submitted here. Plaintiffs have fulfilled, and will continue to fulfill, their duties as representatives of the Class.

When analyzing class counsel for adequacy, courts must ensure that class counsel "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the Defendant." *NFL III*, 821 F.3d at 429. Plaintiff's counsel also satisfies the

As discussed, Attorney Glapion has extensive experience litigating TCPA matters individually and on a class-wide basis. Since founding The Glapion Law Firm in May 2015, Attorney Glapion has been appointed co-lead counsel in *Willis et al. v. IHeartMedia, Inc.*, Case No. 16-CH-02455 (Cook County, Feb. 19, 2016), a TCPA class action in which the court approved an $8.5 million non-reversionary class action settlement, which was successfully administered. In 2017, Attorney Glapion was appointed as sole lead counsel in *Allard et al. v. SCI Direct, Inc.*, a TCPA class action in which the Court approved a $15 million non-reversionary class action

settlement, which was successfully administered. Case No. 17-cv-4692 (N.D. Illinois). In 2018, Attorney Glapion was also appointed co-lead counsel in *Griffith v. ContextMedia, Inc.*, Case No. 16-cv-2900 (N.D. Illinois), a TCPA class action in which the Court approved a $2.9 million non-reversionary settlement, which was successfully administered. Attorney Glapion has also recovered over $1 million for clients in dozens of individual TCPA cases. While class actions are procedurally more complex, Attorney Glapion's familiarity with the underlying law has and will continue to serve the Class well. *See* Glapion Decl. Attorney Glapion has never been found to be inadequate counsel.

Attorney Glapion has also diligently litigated this case. The case was initially filed in the Court of Common Pleas, Allegheny County, Pennsylvania, on November 30, 2020. It was removed on December 21, 2020. On January 26, 2021, Defendant Highmark moved to dismiss, which Plaintiff, through Attorney Glapion, opposed. This Motion was denied in full by the Court on May 14, 2021. On January 27, 2021, Plaintiff Walker, through Attorney Glapion, strategically moved to remand to state Court, which was denied in full on February 4, 2021. This Motion forced the issue of Article III standing earlier in the case than might otherwise be practicable. Thus, while the Motion to Remand was denied, it was denied on grounds favorable to the future of the case, i.e. on the ground that Article III standing was present on the face of the complaint. Defendant Cotiviti was added to the case on December 1, 2021, and moved to dismiss on January 28, 2022. Plaintiff, through Attorney Glapion, opposed, and the Court denied this Motion on June 3, 2022. Glapion Decl., ¶¶ 10-13.

Plaintiff, through Attorney Glapion, served more than 60 requests for production and 19 interrogatories. The Court was also called upon to review numerous distinct discovery disputes. Attorney Glapion received and reviewed thousands of pages of production, including a database

consisting of more than 160,000 telephone numbers and 4 million calls which necessitated hiring third party database experts to parse and review. Attorney Glapion was also able to strategically identify key witnesses and was retained by two additional persons who became aware of the pending case and wanted to participate. Glapion Decl., ¶¶ 14, 27-35.

In short, at all phases, this case was hard fought, vigorously prosecuted, and done at arm's length from Defendants. Accordingly, adequacy is met.

### 2.   Rule 23(b)(3) is satisfied.

To certify a class under Rule 23(b)(3), there must be questions of law or fact common to the proposed class members, which predominate over any questions affecting only individual members, and the class mechanism must be superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). In the settlement certification context, manageability of a trial need not be considered. *See Amchem*, 521 U.S. at 620 (writing "a district court need not inquire whether the case, if tried, would present intractable management problems" in the context of settlement-only class certification.)

**Predominance.** Under Rule 23(b)(3), a class may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." This "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *NFL III*, 821 F.3d at 434. Courts are "more inclined to find the predominance test met in the settlement context." *Id.* (citing *Sullivan*, 667 F.3d at 304 n.29 (en banc)). The case here presents almost entirely common questions. The relevant TCPA provision requires that Defendants have placed pre-recorded calls to cellular telephone numbers without the consent of the called party. A recipient of a wrong number call, by definition, did not consent. As such, Plaintiffs contend that these calls violate the TCPA, unless an exception applies.

Each part of this analysis implicates class wide questions that drive class-wide, rather than

individual, resolutions. "Ultimately, the basic questions in this case are the same for all class members: Did [Defendants] call a putative class member without authorization? And, did a prerecorded or artificial voice play during the call? If the answer to both questions is yes … recovery is appropriate…. [T]hese questions can be litigated as a class." *Head v. Citibank, N.A.*, 340 F.R.D. 145, 154 (D. Ariz. 2022). Accordingly, predominance is met.

**Superiority**. Rule 23(b)(3) "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *NFL III*, 821 F.3d at 434. If a class action potentially avoids thousands of duplicative lawsuits and enables fast processing of a multitude of claims, this factor is met. *See id.* It is met here. Absent class treatment in this case, each individual member of the proposed class would be required to present the same or essentially the same legal and factual arguments, in separate and duplicative proceedings across the country, the result of which would be a multiplicity of trials conducted at significant expense to both the judicial system and the litigants. Such a result would be neither efficient nor fair to anyone, including Defendants. Moreover, there is no indication that class members have a strong interest in individual litigation, let alone any incentive to pursue their claims individually. Indeed, no one else has sued Defendants over their calling practices. Permitting this settlement class will allow all such persons to obtain compensation in one fell swoop. Fairness, efficiency, and finality favor treating this as a class action. *See Susinno v. Work Out World, Inc.*, 333 F.R.D. 354, 363 (D.N.J. 2019).

### B. The Settlement Should be Finally Approved.

#### 1. Overview of Settlement

##### a. Cash Awards

The Settlement Agreement requires Defendant to create a non-reversionary fund of $1,850,000. Settlement Agreement §§ 2.31; 2.35; 3.02. This fund will be used to provide cash

awards to eligible claimants who file an approved claim, as well as cover all administrative costs and attorneys' fees and attorneys' costs. *Id.* at § 3.04. Each claimant who filed an Approved Claim will receive a *pro rata* per-call amount based on the number of Eligible Calls made to that claimant after a disposition described in part 1 of the Settlement Class definition. *Id.* §§ 8.01-8.05.

At the realized claim rate of approximately 21%, Class Members will receive an award of approximately $54.54 per call after deducting estimated fees, costs, and Plaintiffs' incentive awards.

### b. Redistribution and Cy Pres

Should checks remain uncashed after 210 days of the first distribution, and the amount of uncashed checks result in an amount of $1.00 per Eligible Call or more, this remaining amount will be distributed to those who previously filed an Approved Claim and cashed their check. *Id.* § 6.03(e). In the event the amount uncashed is less than $1.00 per Eligible Call, the amount will be distributed *cy pres* to Delaware Nemours. *Id.* § 6.03(f). Unless final approval is not granted or is granted but reversed, no amount may revert to Defendants.

### c. Release

Upon the Effective Date, members of the Settlement Class who did not opt out will have released all Released Claims against each and every one of the Released Parties. *Id.* § 12.03. Plaintiffs and the Settlement Class members who did not opt out further agree not to sue any of the Released Parties with respect to any of the Released Claims, and agree to be forever barred from doing so in any court of law or equity, arbitration proceeding, or any other forum. *Id.* § 12.04.

### d. Service Awards

The Settlement reflects that Plaintiff Walker will seek a $10,000 service award and Plaintiffs Fisher and Sterling will each request a service award of $2,500. *Id.* § 4.03. Any such award will be paid out of the Settlement Fund. *Id.* This award is subject to this Court's approval,

and the Settlement is not conditioned on the Court awarding the requested service awards (or any service award). *Id.* A Motion requesting these amounts is currently pending before this Court. [Dkts. 121-23.]

e.   Attorneys' Fees and Costs

Class Counsel has applied to the Court for an award of attorneys' fees of $616,666.67, costs of $21,161.52, as contemplated by the Settlement Agreement. [Dkts. 121-23.]

f.   Administration and Notice

The Claims Administrator is Epiq Class Action & Claims Solutions, Inc. ("Epiq"). All costs of notice and administration shall be paid from the Settlement Fund. *Id.* §§ 2.34; 3.04. The Claims Administrator timely distributed notice to Settlement Class Members, as well as timely provided CAFA notice as required. *See* Epiq Declaration, ¶¶ 8-16.

**2.   The Settlement meets the *Girsh* factors.**

At the final approval stage, the Court must examine the *Girsh* factors, which are:

> (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).

a.   Complexity and duration of the litigation

"This factor captures the probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) (quotation and citation omitted).

The Settlement discussed herein was reached after nearly two years of litigation. Discovery was detailed and often contentious. Plaintiffs served more than 60 requests for production and 19

interrogatories. The Court was also called upon to review numerous distinct discovery disputes. Plaintiff received and reviewed thousands of pages of production. This production included, but was not limited to, documents showing the call scripts and purposes for all of Defendants' calling campaigns (allowing Plaintiffs to evaluate the strength of Defendants' anticipated "emergency purpose" defense), Defendants' policies and procedures for honoring and documenting do-not-call requests, and a list of all calls and dispositions and their meaning (allowing Plaintiffs to determine which dispositions were indicative of a wrong number call).

This discovery also included the production and review of a database consisting of more than 160,000 telephone numbers and 4 million calls, which necessitated hiring third-party database experts to parse and review. Plaintiff's counsel was able to narrow this database to approximately 9,000 unique telephone numbers that were likely wrong number calls, and later, in conjunction with Defendants' counsel, to about 7,403 unique telephone numbers that were likely cellular telephone numbers.

The Parties also fully briefed (and the Court ruled upon) two Motions to Dismiss and one Motion to Remand. This matter did not resolve until after the Court's ruling on the second of these Motions to Dismiss.

It was only after all of the above that this matter resolved through a mediation before Terrence White of Upchurch Watson White & Max. The mediation lasted a full day and was, as much of this litigation has been, cordial but contentious. The Parties aggressively asserted their positions and began the day far apart on material terms, before ultimately arriving at the Settlement Agreement.

Furthermore, while it is true that TCPA cases are typically "neither challenging nor complex", *Brown*, 242 F. Supp. 3d at 365, to the extent any type of TCPA class action can be

considered an exception to that rule, it is "wrong number" class actions like that here. While class certification in wrong number TCPA cases is doable, it is vigorously contested, expensive, and, on occasion, denied. *See Head*, 340 F.R.D. at 152-54  (noting the split of decisions on certifying a wrong number class but certifying the proposed wrong number class). Certification in such cases almost always necessitates dueling experts on issues such as ascertainability (i.e. whether there is a class-wide way to identify persons who were wrong numbers), which is already a tougher issue in the Third Circuit than in most other circuits.

In addition, this case presented a merits issue that, as far as Plaintiffs are aware, would have been an issue of first impression in this Circuit. Specifically, Defendants' primary defense to liability—that most, if not all, of the calls are exempt from the TCPA's coverage as "emergency purpose" calls—has no on-point Third Circuit precedent. If Defendants prevailed on this argument, the value of the case would be $0. Courts elsewhere have decided this question with conflicting results. *Compare, e.g. Coleman v. Rite Aid of Georgia, Inc.*, 284 F. Supp. 3d 1343, 1346-47 (N.D. Ga. 2018) (concluding the emergency purpose exception cannot apply where the recipient has informed the caller it had the wrong number or the calls were unwanted) *with Roberts v. Medco Health Solutions*, 2016 U.S. Dist. LEXIS 97177, *3 (E.D. Mo. July 26, 2016) (applying emergency purpose exception to wrong number calls).

In short, this case had not only been litigated for a significant amount of time, but there was much runway ahead and it would likely continue for years, but for the Settlement here. As the Court has previously noted, "class counsel has litigated this case for almost two years and engaged in extensive motion practice and discovery[.]" *Walker v. Highmark BCBSD Health Options, Inc.*, 2022 U.S. Dist. LEXIS 225998, *11 (W.D. Pa.. Dec. 13, 2022). This factor weighs in favor of final approval of the Settlement.

b.  <u>The reaction of the class.</u>

The reaction of the class supports final approval. There were 1,631 submitted claims on 7,736 mailed notices[5]—a strong claims rate of just over 21%. By contrast, there were only two requests for exclusion and there were zero objections. Such a strong claims rate against such low opt out/objection rates shows class approval of the settlement. *See In re Cendant Corp. Litig.*, 264 F.3d at 235 ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement."). This factor weighs in favor of final approval of the Settlement.

c.  <u>Stage of the proceedings</u>

"This factor captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Id.*

As detailed above, this case resolved only after significant and meaningful motion practice and discovery to come to an understanding of the scope of the potential Class claims and the potential damages at issue. Plaintiffs successfully opposed two dispositive Motions and prevailed on several discovery disputes. This factor weighs in favor of final approval of the Settlement.

d.  <u>Risks of establishing liability</u>

"A court considers this factor in order to examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *In re Cendant*, 264 F.3d at 237. As discussed previously, the potential downside was significant: Plaintiffs, the Settlement Class, and Class Counsel (who took the case on contingency) could have been left with nothing to show for years of litigation had they lost a difficult class

---

[5] Of these, 7,683 were delivered, a delivery rate of 99.3%. Epiq Declaration, ¶ 16.

certification fight or the issue of first impression regarding the emergency purpose exception. The upside, had Plaintiffs prevailed on every issue and at trial, would be a significantly higher damages number, but even this would not be the panacea it might otherwise seem. Primarily, any verdict in Plaintiffs' and Class Members favor would be bogged down in unpredictable appeals for years. This is especially so if Class Members received maximum statutory damages, as some Appellate Courts have recently questioned whether such damages awards, though statutorily mandated, comport with due process. *See Wakefield v. Visalus*, 51 F.4th 1109, 1120 (9th Cir. 2022) (remanding mandatory nine figure TCPA damages award for consideration of whether those damages violate Due Process). The "discount" in the Settlement relative to the maximum possible award takes into account the uncertainty, costs, and years that would be added to the case if it did not settle. This factor weighs in favor of final approval of the Settlement.

e.  Risks of establishing damages

"Like the [previous] factor, this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time." *In re Cendant*, 264 F.3d at 238 (citations and quotations omitted). This was largely covered in the previous section. To realize more than the current Settlement, litigation would need to continue for years and survive 1) class certification, 2) additional dispositive motions, 3) any changes to the law through Congress (or, more possibly the Supreme Court, 4) trial, and 5) years of appeals. Should any of those fail to break Plaintiffs' and Class Members' way, they would receive nothing. This factor weighs in favor of final approval of the Settlement.

f.  Risks of maintaining a class action

While Plaintiffs believe a class could and would be certified, it is by no means a guarantee. As discussed, Courts have split on if and how a wrong number class can be certified, with the focus of this split on if and how class members can be ascertained. *See Head*, 340 F.R.D at 152-54

(noting the split of decisions on certifying a wrong number class but certifying the proposed wrong number class). Accordingly, the risks of getting a class certified, and maintaining one through trial and appeals, was significant. This factor weighs in favor of final approval of the Settlement.

g.   Ability of Defendants to withstand a greater judgment

This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant*, 264 F.3d at 240. Neither Defendant raised inability to pay as an issue, and the case was evaluated on its merits for the best possible Settlement that could be reached now. This factor ostensibly cuts against final approval, "albeit only moderately, because of the built-in limitations of this kind of analysis[.]" *In re Cendant Corp.*, 264 F.3d at 241.

h.   Range of reasonableness in light of the best recovery and risks of litigation.

Had Plaintiffs prevailed on a class-wide trial, damages would have been approximately $71.5m. This top line number is likely illusory, however, given the discussion above. Indeed, even if Plaintiffs prevailed and obtained the full $71.5m, there is a strong likelihood that such an award would face, at minimum, Due Process concerns, as seen in *Wakefield v. Visalus*. 51 F.4th 1109.

With that said, as discussed in Plaintiffs' Motion for Preliminary Approval, the Settlement is strong, even if it does not result in the "best possible" recovery. Each Settlement Class Member who submitted a claim will receive approximately $54.54 per Eligible Call.[6]  This significantly exceeds the award in many other approved TCPA class action settlements. For example, the Northern District of Illinois granted final approval to a strong TCPA class settlement in which each claimant would be paid $89 *total* (i.e., not on a per call basis) on a 6.9% claims rate. *Ossola*

---

[6] The total number of claimed calls is 19,476. Accordingly, the average Settlement Class Member will receive an estimated settlement payment of $651.32.

*et al. v. American Express Company, et al.*, Case No. 13-cv-4836 (N.D. Ill.) (Dkt. 368.). The Settlement similarly exceeds the relief in most other TCPA settlements, as shown in the following chart:

| Case | Per Claimant Recovery |
|---|---|
| *Walker v. Highmark and Cotivit* | $651.32 |
| *Couser v. Comenity Bank*<br>125 F. Supp. 3d 1034 (S.D. Cal. 2015) | $13.75[7] |
| *Gehrich v. Chase Bank*<br>316 F.R.D. 215 (N.D. Ill. 2016) | $52.50 |
| *Chinitz v. Intero Real Estate Servs.*<br>2022 U.S. Dist. LEXIS 196781 (N.D. Cal. Oct. 28, 2022) | $350 |
| *Johnson v. Moss Bros. Auto Group. Inc.*<br>(C.D. Cal. June 24, 2022) | $460[8] |

This is only a sample. The list of TCPA settlements that achieve a lower per-class member result than the relief obtained here could go on for pages, while the list of settlements that exceed the anticipated per-Class Member relief obtained here is short (one of which was a previous case Plaintiff's counsel litigated). *See Griffith v. ContextMedia, Inc.*, Case No. 16-cv-2900 (N.D. Illinois). "The fact that the recovery rate for the Class here apparently exceeds the recovery rates in other [similar] class action settlements tends to support the reasonableness of the Settlement[.]" *In re Cendant Corp.*, 264 F.3d at 242.

Further, while the Settlement does not provide full statutory relief, this "does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *City*

---

[7] The motion for preliminary approval listed this at $50, in error. The claims rate in *Couser* was 7.7% and resulted in $13.75 per class member.

[8] *Johnson* had no claims process, and each class member was sent $46. For an apples-to-apples comparison, Plaintiff multiplied this number by 10 to show what a 10% claims rate would have looked like there. Or, done in the reverse, a 100% claims rate here would result in an average of $130 per member.

*of Detroit v. Grinnell*, 495 F.2d 448, 455 n.2 (2d Cir. 1974). This is particularly true here. As mentioned, certification in wrong number TCPA cases is doable, but is vigorously contested and, on occasion, denied. *See Head*, 340 F.R.D. at152-54 (noting the split of decisions on certifying a wrong number class but certifying the proposed wrong number class). A denied class certification motion, of course, means the Settlement Class would get nothing absent their own lawsuits. In addition, if Plaintiffs successfully certified a class, it also does not mean it would be certified of the size and scope of the Settlement Class. For example, Defendants have argued that Plaintiffs can only represent persons who received calls as part of the same campaigns as those that called them. If adopted, this narrower certification would cut out tens of thousands of calls and hundreds if not thousands of Settlement Class Members.

Even if Plaintiffs survive class certification unscathed, Defendants' primary defense to liability—that most, if not all, of the calls are exempt from the TCPA as "emergency purpose" calls—is all or nothing. If Defendants prevailed on this argument, the value of the case would approach $0. This argument is by no means a sure thing for either side. There is no Third Circuit precedent on this issue and, as far as Plaintiffs know, it would be an issue of first impression in the Third Circuit. Courts elsewhere have decided this question with conflicting results. *Compare, e.g. Coleman v. Rite Aid of Georgia, Inc.*, 284 F. Supp. 3d 1343, 1346-47 (N.D. Ga. 2018) (concluding the emergency purpose exception cannot apply where the recipient has informed the caller it had the wrong number or the calls were unwanted) *with Roberts v. Medco Health Solutions*, 2016 U.S. Dist. LEXIS 97177, *3 (E.D. Mo. July 26, 2016) (applying emergency purpose exception to wrong number calls).

With these factors considered, the compromise amount of $1,850,000 is within the range of approval. This factor weighs in favor of final approval of the Settlement.

## V.     CONCLUSION

Plaintiffs respectfully request that the Court 1) finally approve the proposed Settlement; 2) finally certify the proposed Class; 3) finally appoint Plaintiff's attorney Jeremy M. Glapion of Glapion Law Firm as Class Counsel; 4) grant Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards; and 5) grant any other relief this Court deems necessary, just, and proper.

Dated: April 17, 2023

*/s/ Jeremy M. Glapion*_____
Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com

20